**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| DAVID CHENG, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  1:11-cv-10007 |
| | ) | |
| LAURA ROMO, M.D., | ) | **Leave to file in excess of page limit** |
| | ) | **granted on May 23, 2012 (Docket Entry** |
| Defendant. | ) | **No. 25)** |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case concerns a claim of unlawful interception of electronic communications by Defendant Laura Romo ("Romo") from an e-mail account of her business partner David Cheng ("Cheng"). Romo admits to accessing, printing, and sharing e-mails that were stored in Cheng's personal e-mail account. She claims that this conduct was not unlawful, however, because Cheng's grant of permission to Romo to access his personal e-mail account, given in 2000 to review a specific medical report, should be treated as a blanket permission to access his e-mails seven (7) years later for any purpose. If that proposition is not, on its face, sufficiently absurd to reject Romo's motion for summary judgment, then all the Court need do is to look at Romo's contradictory testimony, admissions regarding her efforts to conceal her review of Cheng's e-mail, after-the-fact justifications for accessing Cheng's e-mail, and destruction of critical evidence, to conclude that material facts are in dispute that preclude summary judgment.

**I. STATEMENT OF THE FACTS**

**A.     The Parties' Limited Personal E-mail Account Sharing Agreement.**

In 2000, Romo and Cheng joined Advanced Radiology, Inc. ("Advanced"), a Rhode Island radiology practice founded by Dr. Roman Klufas. (Affidavit of Zachary W. Berk, Esq.

(the "Berk Aff."), submitted herewith, at Exhibit A (Transcript of October 4, 2011 Deposition of David Cheng, M.D.), p. 9:12-24; Berk Aff. at Exhibit B (Transcript of November 23, 2010 Deposition of Laura Romo, M.D.), p. 32:9-12).[1]  Romo and Cheng are Board certified radiologists and had practiced and studied under Klufas at Brigham & Woman's Hospital in Boston.  In the early stages of their employ, Cheng shared his Yahoo! e-mail password with Romo.  Cheng opened the Yahoo! account in or shortly before July, 2000, for his personal use. (Ex. A, p. 18:10-23).  Cheng testified that he provided Romo with his Yahoo! e-mail password over the phone while he was driving his car so that she could read a specific consultant e-mail or open a specific medical report. (*Id.*, p. 21:1-24).  Cheng further stated that it was understood by Romo that his Yahoo! account was a personal account and that he granted her permission to access the account on a "single action" basis to read whatever specific medical information was at issue. (*Id.*, pp. 23:17-21, 24:5-7).  Romo subsequently gave Cheng the password to her e-mail account so that he could access similar reports while she was out of the office. (*Id.*, pp. 22:18-23:3).

Cheng testified that his and Laura's need to access one another's e-mail became increasingly rare after Advanced acquired a computer system in August of 2002 that allowed them to sign one another's reports without having to use e-mail. (*Id.*, pp. 86:3-87:1).  Their need to access each other's e-mail became even more rare after Advanced hired Dr. Krishanu Gupta, a musculoskeletal system specialist, which obviated the need to engage the consultants they had been using. (Berk Aff. at Exhibit C (Plaintiff David Cheng, M.D.'s Answers to Defendant Laura Romo, M.D.'s First Set of Interrogatories), Answer to Int. No. 1).  In total, Cheng stated that

---

[1]  After the initial reference to each exhibit attached to the Berk Aff., all subsequent references thereto are by exhibit letter only (*e.g.*, Ex. A).

there were at most six occasions when he authorized Romo to access his Yahoo! e-mail account. (*Id.*).

During her first deposition, Romo confirmed the narrow scope of her e-mail account sharing arrangement with Cheng. Romo explained that she and Cheng gave each other their e-mail passwords for the limited purpose of accessing consultants' comments to one another's medical reports when the other doctor was out of the office. (Ex. B, pp. 32:18-34:4). Romo acknowledged that, given the limited purpose for which Cheng provided his e-mail password, it was unusual for her to need to access Cheng's e-mail account. (*Id.*, p. 34:6-10). She also stated that she never looked at any of Cheng's e-mail other than the consultants' comments, including his personal e-mail, which she admits she never asked for permission to read. (*Id.*, pp. 34:17-35:3, 37:23-25). Romo testified that she looked at Cheng's e-mails "[o]nly if the need came up, only if I was asked[.]" (Berk Aff. at Exhibit D (Transcript of October 25, 2011 Deposition of Laura Romo, M.D.), p. 14:11-19). Romo agreed that the need to have access to Cheng's personal e-mail account (and vice versa) ended after Advanced installed new software in 2002 and once Dr. Gupta was hired. (Ex. B, pp. 35:22-37:8). She further testified that she did not go into Cheng's e-mail account in 2005, 2006 or 2007, until she accessed it in late September, 2007, to investigate various activities at Advanced. (*Id.*, pp. 25:5-18, 26:3-14). Romo later changed her testimony and stated that she accessed Cheng's e-mail account in 2005, 2006, and 2007, when the need arose. (Ex. D, pp. 12:13-13:13).

## B.    Romo's Investigation of Advanced and Her Unauthorized Access of Cheng's Personal E-mail Account.

In 2003, Romo and Cheng became shareholders of Advanced with Dr. Klufas and, later, Dr. Gupta also became a shareholder. (Ex. A, pp. 10:21-11:17). Romo's husband, Dr. John Romo ("John"), was hired around the same time and ultimately became Advanced's office

3

administrator with oversight responsibility over the technicians and other employees. (*Id.*, pp. 13:19-14:7, 15:20-16:10).

Relationships between John and Klufas, Cheng, and Gupta deteriorated in 2007 for a number of reasons, the details of which are not germane to this case. It is sufficient to note that clashes between John and other employees escalated to the point that the partners were required to step in and reduce his interactions with them and reduce some of his responsibilities. (*Id.*, pp. 56:3-61:24). A letter placing John on probation was issued in September of 2007. (*Id.*, p. 56:3-6; Ex. B, p. 15:2-22).

Some time shortly after the probation letter was issued, Romo went to see a lawyer. (Ex. B, p. 59:15-21). Then, right after meeting with her lawyer, she logged into Cheng's e-mail account and admitted to doing so on at least five occasions after September, 2007. (*Id.*, pp. 24:21-24, 26:3-14). At first, Romo testified that she did not access Cheng's e-mail account after late 2007, but, when confronted with e-mails she had printed, she changed her testimony and acknowledged accessing Cheng's account from September of 2007 into at least May of 2008 if not later. (*Id.*, p. 24:18-29:19). Romo read many of Cheng's e-mails and printed some of them. (*Id.*). Romo testified that each time she accessed Cheng's e-mail account she did so from her teenage son's computer, which was located in his bedroom. (Berk Aff. at Exhibit E (Transcript of November 30, 2010 Deposition of Laura Romo, M.D.), pp. 236:12-237:4). Romo stated that she never used her son's computer for any purpose other than to review Cheng's e-mails. (*Id.*, p. 237:21-24). Romo contradicted her testimony a year later stating that she used her son's computer "from time to time, days and evenings." (Ex. D, p. 19:14-20). Romo's testimony was also contradicted by John, who testified that she would use their son's computer "now and then" and "a couple of times a month . . . at least." (Berk Aff. at Exhibit F (Transcript of November

15, 2011 Deposition of John D. Romo, M.D.), pp. 24:15-21, 25:4-9).  Romo said that she used her son's computer to access Cheng's e-mail because she was "very uncomfortable" doing so and "didn't want to use [her] computer." (Ex. E, p. 236:5-11).  While Romo now says that she had permission to access Cheng's e-mail account, Romo testified four (4) different times that she was "uncomfortable" accessing Cheng's e-mail in September, 2007, and thereafter, and that she did not want to stay online for a very long time when she was reviewing Cheng's e-mails.  (Ex. B, pp. 17:23-25, 24:6-7; Ex. E, pp. 236:7-8, 238:9-11; Ex. D, p. 42:4-14).  Romo never asked Cheng for permission to review his e-mails or told him that she had accessed his account.  (Ex. B, pp. 32:1-3, 37:23-25).  She also did not tell any of her partners she had done so.  (*Id.*, p. 27:1-5).  In fact, she acknowledged she had no discussion with Cheng about his e-mail account after 2002.  (*Id.*, p. 37:9-12).

Romo was also unable to tell a consistent story of why she intercepted Cheng's e-mails.  At first, Romo said it was because she thought information was being withheld from her.  (*Id.*, p. 20:6-13).  Then she said it was her husband's probation letter that prompted her to secretly go into Cheng's e-mail.  (*Id.*, p. 17:8-25).  Later Romo said it was to get billing information.  (Ex. E, p. 242:7-14).  She also testified, however, that she did not even read e-mails between Cheng and Klufas.  (Ex. D, p. 9:7-24).  Later, though, forgetting her earlier testimony no doubt, she said that she did read such e-mails, or that she may have skimmed them.  (*Id.*, pp. 48:22-49:13).  Despite Romo's supposed concerns about billing and what her partners were discussing in late 2007, she reviewed Cheng's e-mails as far back as March of 2006.  (Ex. B, p. 23:9-20).  Whatever her professed reason now for her interception of Cheng's e-mails, it is undisputed that the only e-mails she printed were e-mails between Cheng and another employee that contained sexual overtones and that she never shared with her partners.  (Ex. E, p. 244:6-24).

5

Romo did not stop there.  Her clandestine attempt to gather information, coming after she met with counsel, included secretly recording a meeting with her partners, twice recording conversations with an employee without telling that employee, and attempting to break into an employee's filing cabinet that she knew contained personal items. (Ex. B, pp. 40:7-41:7, 50:4-19, 56:19-57:25).

In late 2008, after Romo's counsel had been engaged and at or about the time she filed suit against Advanced and Klufas in the Rhode Island Superior Court, Romo discarded the computer she had used to access Cheng's e-mail account.  (Ex. E, p. 237:5-20; Ex. D, pp. 79:16-81:16).  This destruction of evidence on the eve of filing suit has deprived Cheng of the ability to examine the computer and determine the number of occasions his e-mails were intercepted, or what was read or printed.

### C.   Advanced's Employee Policy and Procedures Manual.

Despite not once mentioning at any of her three depositions that she accessed Cheng's e-mail account pursuant to the terms of Advanced's Employee Policy and Procedures Manual (the "Employee Manual"), Romo attempts to justify her unauthorized review of Cheng's e-mail by claiming that it was her right to do so under the Employee Manual.  The terms of the Employee Manual, however, were not intended to and did not apply to Cheng, or any of the other business owners.  Katherine Lagor ("Lagor"), the Advanced employee responsible for enforcing the Employee Manual, does not enforce the manual's provisions with regard to her "bosses," the radiologists. (Berk Aff. at Exhibit G (Transcript of November 18, 2011 Deposition of Katherine Lagor), pp. 29:14-15, 36:2-5).  The introduction section of the Employee Manual distinguishes between "Advanced Radiology employees and staff" and "management." (Berk Aff. at Exhibit H (Employee Manual), p. 2).  It further provides that the "policies and procedures [in the

Employee Manual] are intended to be guides to management and merely descriptive of suggested procedures to be followed." (*Id.*). The introduction states that "Advanced Radiology's management reserves the right to revoke, change or supplement guidelines at any time without notice." (*Id.*).

The Employee Manual contains an acknowledgement of receipt signature page that, among other things, acknowledges that changes to the policies "will be communicated to me by my supervisor or through official notices." (*Id.*, p. 3). There is no evidence in the record that Cheng ever executed an acknowledgement of receipt of the Employee Manual. The Employee Manual also contains a "Statement of Commitment to Employees" that, among other things, provides "[w]e believe that each employee's interest can best be represented through direct, honest discussions with his or her supervisor or manager" and highlights "[m]anagement's commitment to provide a work environment and leadership which unites employees . . ." (*Id.*, p. 6). There is also an "Employee Orientation" provision that has a stated goal of "establish[ing] good employee-employer communication," and an "Evaluation Period" provision that provides that a "supervisor will evaluate the employee's work." (*Id.*, p. 10). The Employee Manual also provides that "[a]ny employee leaving the facility for meals or any other non-business-related reason must be clocked out during their absence from the facility." (*Id.*, p. 16). There are also vacation, sick and personal leave, performance improvement, termination, and other policies that clearly do not apply to the business owners. (*Id.*, pp. 19, 21, 25, 26).

The Employee Manual's "Internet Usage" provision does not authorize Advanced's management to obtain and use employees' personal e-mail passwords to determine what, if any, e-mail communications employees engaged in during work hours. The Internet Usage section states that "[i]nternet usage is subject to monitoring at any time." (*Id.*, p. 32). It further provides

that "[a]ll of an employee's online communications and internet visits made during business hours are not considered to be private." (*Id.*).

While it is undisputed that the Employee Manual exists, it is not distributed to everyone at Advanced. (Ex. A, pp. 51:19-52:1). Furthermore, most of the Employee Manual's provisions, including the internet usage provision, are not enforced by Advanced. (Ex. G, p. 29:14-15). The internet usage provision is not enforced because Advanced employees are permitted to use their work computers for personal e-mail. (*Id.*, pp. 31:19-32:9, 33:14-34:8, 35:5-8).

## II. ARGUMENT

### A.   Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if there exists a sufficient evidentiary basis on which the trier of fact could find for the non-moving party." *Mitchell v. US Airways, Inc.*, CIV.A. 08-10629-WGY, 2012 WL 1512432, at *9 (D. Mass. May 1, 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is 'material' if it will affect the outcome of the case under the applicable law." *Id.* "The moving party bears the burden of showing that no genuine issue of material fact exists." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* (quoting *Anderson*, 477 U.S. at 255). "Save as to facts admitted by both parties, the court must disregard all evidence—even if unopposed—which the jury is free to reject, i.e., all evidence upon which a party bears the burden of proof." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). Therefore, summary judgment

may only "be granted when a fair-minded jury could reach only one conclusion: in favor of the moving party." *Id.*

### B.   Factual Issues Concerning The Scope Of Cheng's Authorization For Romo To Access His Yahoo! E-mail Account Necessitate A Trial.

Cheng testified that he gave Romo his Yahoo! e-mail account password so that she could access his account on a "single action" basis, *i.e.*, whenever he specifically asked her to look for something. (*See* Ex. A, p. 24:5-7). Romo confirmed Cheng's account of the extent of her authorization to access his e-mail account in testifying that she only looked at Cheng's e-mail "if I was asked." These two statements alone demonstrate that there is an issue of fact concerning Romo's claim that Cheng granted her unfettered access to his e-mail account. The parties' other testimony, particularly Romo's admitted uneasiness about accessing Cheng's e-mail account in late 2007, only serves to support Cheng's position that he and Romo shared their passwords for a specific, limited purpose.

### 1.   Cheng's Stored Communications Act Claim.

The Stored Communications Act ("SCA") was enacted by Congress to protect stored e-mail messages because it recognized that "the information [in these communications] may be open to possible wrongful use and public disclosure by . . . unauthorized private parties." *United States v. Councilman*, 418 F.3d 67, 80-81 (1st Cir. 2005) (quoting S.Rep. No. 99–541, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557). The SCA provides for civil liability when one "intentionally accesses without authorization a facility through which an electronic communication service is provided . . . [or] intentionally exceeds an authorization to access that facility . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system[.]" 18 U.S.C. § 2701(a).

The term "authorization" is not defined by the SCA. Although courts have not agreed

upon a single definition of "authorization" under the SCA, they appear to be in agreement that "the sort of trespasses to which the [SCA] applies are those in which the trespasser gains access to information to which he is not entitled to see." *Educational Testing Service v. Stanley H. Kaplan, Educational Center, Ltd.*, 965 F. Supp. 731, 740 (D.Md. 1997).  The Ninth Circuit has likened a violation of the SCA to a common law trespass claim and has stated that "[p]ermission to access a stored communication does not constitute a valid authorization if it would not defeat a trespass claim in analogous circumstances." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2003).  Courts have elaborated on this concept in finding that "even with authorization to access the facility, a trespasser who accesses unauthorized *information* constitutes an [SCA] violation." *Executive Security Mgmt., Inc. v. Dahl*, No. CV 09-9273 CAS, 2011 WL 5570140, at * 19 (C.D.Cal. Nov. 15, 2011) (citing *Theraputic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 997 (E.D.Cal. 2007)) (emphasis in original).  The SCA is intended to address access to a "facility without *specific* authorization to do so." *Penrose Computer Marketgroup, Inc. v. Camin*, 682 F. Supp. 2d 202, 210 (N.D.N.Y. 2010) (quoting *Educational Testing Service*, 965 F. Supp. at 740) (emphasis added).  The Fifth Circuit has stated that "the scope of an individual's authorization to access a computer network is analyzed 'on the basis of the expected norms of intended use.'" *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 631, 636 (E.D.Va. 2009) (quoting *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007)).

The scope of a party's authorization to access an e-mail account, when in dispute under the SCA, presents a genuine issue of fact to be resolved by the factfinder at trial.  *See, e.g., Executive Security Mgmt., Inc.*, 2011 WL 5570140, at *19.  In *Executive Security Management, Inc.*, the plaintiff corporations alleged that two former employees violated the SCA by "improperly and secretly retain[ing], without authorization, access to e-mail accounts" of one of

the plaintiffs' CEOs and plaintiffs' general counsel. *Id.* at *2. One of the accused defendants had been employed by one of the plaintiffs as a Vice President and Secretary, and served as a member of the company's Board of Directors. *Id.* The other defendant was employed by one of the plaintiffs as a Director of Marketing and Public Relations. *Id.* The defendants moved for summary judgment on the SCA claim arguing that they were authorized to access the subject e-mails because they were both "administrators of [the company's] email accounts" and "it was their job to do so." *Id.* at *18. The plaintiffs opposed the motion claiming that the defendants were not authorized to access e-mails that were not addressed to them. *Id.* at *19.

Despite evidence that the defendants were "expressly authorized—and, in fact, required as part of their jobs—to access and maintain [the company's] email systems," the court denied the defendants' motion for summary judgment. *Id.* The court found that "there is a question of material fact as to whether [defendants] 'exceeded' their authorization to access [the company's] emails" because "several witnesses indicat[ed] [one of the defendants] possessed emails he had not been authorized to see." *Id. See also Penrose Computer Marketgroup, Inc.*, 682 F. Supp. 2d at 210 (motion to dismiss SCA claim denied because the fact that the defendant had "full access to the Plaintiff's computer system, [] does not support the conclusion that Defendant had authorization to access another employee's email account"); *Global Policy Partners, LLC*, 686 F. Supp. 2d at 637 (motion to dismiss SCA claim denied because factual inquiry was required to determine scope of defendant's authorization to access e-mail accounts); *Fischer v. Mt. Olive Lutheran Church, Inc.*, 207 F. Supp. 2d 914, 926 (W.D.Wisc. 2002) (motion for summary judgment as to SCA claim denied due to existence of disputed material facts).

As in *Executive Security Management, Inc.*, material questions of fact exist in this case regarding the scope of Romo's authorization to access Cheng's e-mail account, and whether she

had any authorization at all, that preclude her motion for summary judgment. Cheng testified that he initially gave Romo his Yahoo! e-mail account password during a conversation he had with her while he was driving his car so that she could access a specific e-mail on that particular occasion. Cheng further explained that he gave Romo authorization to access his e-mail on a "single action" basis, which is consistent with his statement in his sworn interrogatory answers that he made specific requests of Romo when he needed her to access his e-mail. Cheng stated that he authorized Romo to access his e-mail account on no more than six occasions. He also testified that the need to for him and Romo to access one another's e-mail was virtually eliminated in 2002 or 2003 because of various changes in the information systems at Advanced.

Romo's testimony only serves to support Cheng's version of their e-mail sharing arrangement. She stated that they shared passwords for the limited purpose of accessing work related e-mails when one of them was out of the office. Romo said that it was unusual for her to access Cheng's account, that she never looked at any e-mail other than the specific work-related correspondence at issue, and that she only looked at Cheng's e-mail "if I was asked." Romo also corroborated Cheng's testimony that the need to access one another's e-mail ended in or around 2002. Moreover, before she changed her testimony, Romo stated that she did not go into Cheng's e-mail at all in 2005, 2006, or 2007, until she accessed it in late September, 2007, without Cheng's knowledge. Romo also repeatedly stated that she was "very uncomfortable" when she accessed Cheng's account in late 2007, which suggests that she knew that she did not have authorization to do so.

Ultimately, not only is there a substantial amount of evidence to dispute Romo's claim that she was authorized to access Cheng's e-mail at her pleasure, Romo's testimony supports the contrary conclusion that summary judgment for Cheng is warranted. Nonetheless, at a

12

minimum, the court must draw all inferences from the evidence in Cheng's favor in considering whether any genuine issues of material fact exist. Clearly, there is evidence in the record that, if believed, supports the conclusion that Romo accessed information that "[s]he [wa]s not entitled to see," and without "specific authorization," when she logged into Cheng's Yahoo! e-mail account over an eight-month period in late 2007 and 2008. As such, Romo's motion for summary judgment as to the SCA claim must be denied.

2.      Cheng's Massachusetts Privacy Act Claim.

For the same reasons, genuine issues of material fact exist regarding Cheng's invasion of privacy claim under G.L. c. 214, § 1B (the "Privacy Act"). The Privacy Act authorizes damages in the event that a person is subjected to an "unreasonable, substantial or serious interference with his privacy." G.L. c. 214, § 1B. It has been recognized that "the contents of private account emails qualify as 'highly personal or intimate' in nature" and that "the accessing of a person's private e-mail account may qualify as such an intrusion." *Coughlin v. Town of Arlington*, C.A. No. 10-10203-MLW, 2011 WL 6370932, at *10 (D. Mass. Dec. 19, 2011) (citing *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010)). Summary judgment is not appropriate on a Privacy Act claim when genuine issues of material fact exist regarding whether a person had "a reasonable expectation of privacy in [his or her] e-mail messages and whether [a defendant's] reading of the e-mail messages constituted an unreasonable, substantial or serious interference with [the plaintiff's] privacy." *Restuccia v. Burk Technology, Inc.*, No. CA 952125, 1996 WL 1329386, at *3 (Mass. Super. Aug. 13, 1996). Romo argues that she "cannot be held liable for invasion of privacy" because the undisputed facts show that "Cheng voluntarily and unconditionally allowed her access to the account." (Memorandum of Law, p. 17). As is noted above, however, the record demonstrates that there are numerous questions of fact regarding the

13

extent to which Cheng granted Romo access to his personal e-mail account. Therefore, whether Cheng had a "reasonable expectation of privacy" in his Yahoo! e-mail account, and whether Romo's review of his e-mails was "an unreasonable, substantial or serious" interference with Cheng's privacy, cannot be decided on summary judgment. *See Restuccia*, 1996 WL 1329386, at *3 (summary judgment denied as to Privacy Act claim because of questions of fact related to the defendant's review of plaintiff's e-mail messages); *see also Coughlin*, 2011 WL 6370932, at *11-12 (motion to dismiss Privacy Act claim denied on grounds that "accessing a personal email account without permission or notice may not be [a reasonable intrusion]" into an employee's privacy).

### 3. Cheng's Alleged Failure to Communicate Limitations On Romo's Access To His Personal E-mail Account.

Romo acknowledges that the parties have disputed versions of their e-mail password sharing agreement, but she claims that she is still entitled to summary judgment because "there is no dispute whatsoever that Cheng *did not communicate* any such limitation to Romo." (Memorandum of Law, p. 13). This position is both inaccurate and illogical. First, as is noted above, Cheng did communicate a limit on Romo's authorization to access his e-mail when he initially gave Romo his password for the specific purpose of accessing a particular work related e-mail. Thereafter, Cheng authorized Romo's access on a "single action" basis, which Romo acknowledged when she testified that she only went into Cheng's e-mail "if I was asked." Second, even assuming *arguendo* that the record did not contain evidence that Cheng made it clear Romo had limited authorization to access his e-mail, the fact that he allegedly did not expressly spell out the parameters of her authorization does not entitle her to free reign over his e-mail account. The cases discussing the SCA hold that one must have "specific" authorization to access private stored communications without being in violation of the statute. *See Penrose*

*Computer Marketgroup, Inc. v. Camin*, 682 F. Supp. 2d at 210.  Specific authorization to access

an e-mail account at one's pleasure is not granted when a party is given an e-mail password on a

specific occasion, for an express limited purpose, simply because there has been no instruction

that the e-mail account may not be accessed for all other conceivable purposes.  Such a result

would be contrary to common sense and the "expected norms of intended use" of an e-mail

password that is shared for a specific, limited purpose.  *See Global Policy Partners, LLC*, 686 F.

Supp. 2d at 636.

In addition, despite Romo's suggestion to the contrary, the fact that Cheng did not take

affirmative steps to curtail or limit Romo's access to his e-mail account does not support the

conclusion that she was authorized to access his e-mail in 2007.  In fact, this evidence actually

supports Cheng's position.  Cheng did not change his password or take other steps to limit

Romo's access to his e-mail because he only authorized Romo to access the account on a few

specific occasions.  Based on his understanding with Romo, Cheng did not think there was any

need to take affirmative steps to prevent Romo from going into his e-mail.  This is further

supported by Cheng's testimony that he was "surprised and shocked" when he learned that Romo

went into his e-mail account in 2007 and 2008.  (Ex. A, p. 66:19-23).

The absurdity of Romo's position is even more glaring when it is viewed in the context of

a traditional trespass scenario as opposed to a claim under the SCA.  If a person is given the key

to a neighbor's home to walk the dog while the neighbor is away on vacation, that person could

not reasonably argue that he or she was authorized to enter into the home in perpetuity to eat

food out of the refrigerator, borrow the neighbor's clothes, and use the pool, simply because he

or she were never told not to do so.  *See Pure Power Boot Camp v. Warrior Fitness Boot Camp*,

587 F. Supp. 2d 548 (S.D.N.Y. 2008) ("there is no sound basis to argue that [plaintiff], by

168148.2

inadvertently leaving his Hotmail password accessible, was thereby authorizing access to all of the Hotmail emails[.] . . . If he had left a key to his house on the front desk at [his office], one could not reasonably argue that he was giving consent to whoever found the key, to use it to enter his house and rummage through his belongings").

The cases relied on by Romo to support her position are all distinguishable from the facts of this case. In *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F. Supp. 2d 817, 821 (E.D.Mich. 2000), it was undisputed that the defendant had been given unlimited access to the computer network at issue. The plaintiff's SCA claim in *Int'l Assoc. of Machinists and Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 497 (D.Md. 2005), was dismissed because it was undisputed that the defendant was "entitled to see" the customer lists that she was accused of obtaining without authorization and misusing. In *Lasco Foods, Inc. v. Hall and Shaw Sales, Marketing, & Consulting, LLC*, 600 F. Supp. 2d 1045, 1050 (E.D.Mo. 2009), the plaintiff's SCA claim was dismissed because it was undisputed that the defendants had "virtually unrestricted access to [plaintiff's] information" and the plaintiff did not allege any facts to support its claim that the defendants exceeded their authorization in accessing the plaintiff's computers. Unlike the cases cited by Romo, here there is a genuine dispute regarding whether Romo was given unlimited access to Cheng's e-mail account. There is substantial evidence that, when viewed in the light most favorable to Cheng, supports the conclusion that Cheng authorized Romo to access his e-mail account on only a handful of specific occasions, for specific purposes.

Finally, to the extent that Romo is arguing that her subjective understanding regarding the scope of her authorization to access Cheng's e-mail is determinative on summary judgment, such an argument must be rejected. Notwithstanding the direct and circumstantial evidence that

168148.2

contradicts Romo's claim there was no limit on her authority to access Cheng's e-mail account, statements of her subjective understanding are insufficient to demonstrate that there are no issues of material fact concerning Cheng's SCA and Privacy Act claims. "[A] number of courts, including [the First Circuit], have been reluctant to permit summary judgment where the nonmoving party *demonstrates a genuine dispute as to the credibility* of the witness whose subjective [state of mind] is at issue, particularly where cross-examination offers the only realistic prospect for resolving the credibility concern." *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 490 (1st Cir. 1992). Romo's deposition testimony raises serious concerns regarding her credibility. She changed her testimony several times concerning key facts in this case, such as the frequency with which she accessed Cheng's e-mail account, the reasons she accessed the account, and the frequency with which she used her son's computer.

C.   **Advanced's Employee Manual Did Not Authorize Romo To Access Cheng's Personal E-mail Account.**

Romo's claim that Advanced's Employee Manual authorized her to access Cheng's personal e-mail account is disingenuous and wrong. It is disingenuous because Romo did not once during the three days she was deposed state that she accessed Cheng's e-mail pursuant to her now supposed right to do so under the Employee Manual's internet usage policy. In fact, the evidence suggests that Romo knew that she was not authorized, by the Employee Manual or otherwise, to access Cheng's account. Romo had not accessed Cheng's account for years, she testified on four (4) occasion that she was "uncomfortable" logging into the account, and she stated that she logged into the account from her son's computer, which she never used, because she did not want to use her own. Moreover, there are significant questions regarding whether Romo accessed Cheng's account on behalf of Advanced or for personal reasons. At a minimum,

17

the record establishes that there are genuine issues of material fact regarding whether Romo accessed Cheng's e-mail account pursuant to the policies set forth in the Employee Manual.

Even if it were undisputed that Romo thought she could access Cheng's e-mail under the Employee Manual's policies, Romo would have been wrong because the Employee Manual did not authorize her to log into the other business owners' personal e-mail accounts to review all of their contents.  First, the Employee Manual, by its terms, makes it clear that it does not apply to management or owners of the business.  It is nonsensical to think that Cheng, a doctor and owner of Advanced, would be subject to an Employee Manual that, among other things, discusses his relationship with management, warns that management can change his terms of employment, explains that he will be evaluated by a supervisor, and requires him to "clock out" whenever he leaves a business facility for non-work related matters.  Moreover, Lagor, who is responsible for enforcing the Employee Manual's policies, testified that she does not do so with regard to her "bosses," the radiologists.  Second, there are factual questions regarding whether the Employee Manual was even enforced by Advanced.  Romo never mentioned it when she was deposed and Cheng testified that it was "not necessarily distributed to everyone." (Ex. A, p. 51:24-25).  Lagor testified that many of the Employee Manual's provisions, including the internet usage policy, are not enforced.  (Ex. G, p. 29:14-15).  There is also no evidence in the record showing that Cheng signed the Employee Manual's acknowledgement page or that Advanced ever monitored internet usage under the policy.

Third, even if the Employee Manual were applicable to Advanced's owners, which it is not, it does not authorize Advanced's management to log into employees' personal e-mail accounts.  The provision relied upon by Romo to justify her intrusion into Cheng's e-mail is titled "Internet Usage."  The name of the provision alone suggests that it concerns the websites

18

that Advanced's employees may visit and not the contents of their personal e-mail accounts.  The

language of the provision verifies this conclusion.  The policy specifically states:

> [a]ccess to the internet from Advanced Radiology's network is for business
> purposes only. . . .  Specific instances [of misuse] include accessing objectionable
> web sites, sending or receiving email for private use and participating in either
> instant messaging or chat rooms.
>
> Internet usage is subject to monitoring at any time.  All of an employee's online
> communications and internet visits made during business hours are not considered
> to be private.

(Ex. H, p. 32).  The language of the policy is intended to address the websites that employees

may "access" or visit during business hours.  It notifies employees that Advanced may monitor

their "internet usage," *i.e.*, what websites they visit, and gives examples of websites that should

not be accessed during work hours.  Nowhere does the internet usage policy suggest that

Advanced may obtain employees' personal e-mail passwords and sign into their e-mail accounts

after-the-fact to determine what, if any, communications were made during business hours.  Even

if the internet policy went so far as to authorize Advanced to access employees' e-mail accounts

to review communications made during business hours, there is no evidence in the record

regarding whether Romo was aware that Cheng's Yahoo! e-mail account contained any

unauthorized e-mail communications made during business hours when she accessed it.

The e-mail policy at issue in this case is similar to the one considered by the court in the

*Pure Power Boot Camp* case.  587 F. Supp. 2d 548.  There, the employee handbook provided

that "e-mail users have no right of personal privacy in any matter stored in, created on, received

from, or sent through or over the system. . . .  The Company . . . reserves the right to review,

monitor, access, retrieve, and delete any matter stored in, created on, received from, or sent

through the system[.]"  *Id.* at 552-53.  The court, however, rejected the employer's argument that

the employee handbook authorized it to access a former employee's Hotmail account.  The court

explained that "there is nothing the [e-mail] policy that even suggests that if an employee simply views a single, personal e-mail from a third party e-mail provider, over [company] computers, then all of the [*sic.*] his personal e-mails on whatever personal e-mail accounts he uses, would be subject to inspection." *Id.* at 560. The court therefore found that the case was "distinguishable from those cases which hold that employees have no expectation of privacy in e-mails sent from or received and stored on the employer's computer." *Id.* The court also noted that even if the employees' personal e-mail accounts were subject to review under the policy, the employer did not prove that it was entitled to access them because it did not present any evidence that "the e-mails in issue were created on, sent through, or received from [company] computers." *Id.* at 559.

As in *Pure Power Boot Camp*, there is nothing in Advanced's Employee Manual that suggests that an employee's personal third party e-mail account is subject to inspection by the company.[2] In addition, Romo has presented no evidence regarding whether the specific e-mails she reviewed were sent from or received on Advanced's computers during business hours. The cases relied on by Romo are all distinguishable for the same reasons the court rejected the employer's cases in *Pure Power Boot Camp*. *See In re Reserve Fund Sec. and Derivative Litig. v. Reserve Mgmt. Co., Inc.*, 275 F.R.D. 154, 158 (S.D.N.Y. 2011) (e-mails sent over company e-mail system and stored on company server were subject to inspection by employer under its specific e-mail policy); *Garrity v. John Hancock Mut. Life Ins. Co.*, No. CIV.A. 00-12143-RWZ, 2002 WL 974676, at *1-2 (D. Mass. May 7, 2002) (employees did not have reasonable expectation of privacy in e-mails that were sent using company e-mail accounts, stored on the

---

[2]  Romo's claim that the "undisputed facts conclusively establish that [Cheng's] Yahoo! account . . was a business account" is misguided. Cheng testified that he opened the account for his personal use. (Ex. A, p. 18:10-23). Lagor explained that everyone at Advanced uses their personal e-mail accounts for work. (Ex. G, pp. 19:23-20:5). Simply because Cheng used his Yahoo! account for business does not mean that it is no longer a personal e-mail account and that its contents are the property of Advanced.

company's intranet system, and forwarded to third parties without restriction). Romo's reliance on *Cort v. Bristol-Myers Co.*, 385 Mass. 300 (1982), is also misplaced. That case provides that employers are justified in seeking more personal information from employees or prospective employees, via employee questionnaires or other inquiries, the more sophisticated their positions are. *Id.* at 308. It does not provide that high-level professionals generally have a lower expectation of privacy in their e-mail communications.

Lastly, should the Court determine that the meaning of the Employee Manual's e-mail policy is ambiguous, the interpretation of the Employee Manual presents a question of fact for trial. *See, e.g., Berry v. General Motors Corp.*, 796 F. Supp. 1409, 1417-18 (D.Kan. 1992) (interpretation of ambiguous provision of employee policy presents question of fact for trial).

Based on the foregoing, there are genuine issues of material fact regarding whether the Employee Manual authorized Romo to access Cheng's personal e-mail account and whether Cheng had a reasonable expectation of privacy in his e-mail in light of the internet usage policy that preclude summary judgment.

### D.   Factual Issues Concerning Whether Romo Accessed Cheng's E-mail For Legitimate Business Reasons Necessitate A Trial.

Romo does not identify an exception, because there is none, under the SCA for accessing e-mail without authorization pursuant to a legitimate business reason. It is simply not material that the snooping was for legitimate business reasons or not. Romo's position that she accessed Cheng's e-mail for legitimate business reasons also does not entitle her to summary judgment on Cheng's Privacy Act claim because of several disputed issues of fact that it raises.[3]

---

[3] It should be noted that Romo does not cite a single case in which a court has granted summary judgment based on a party's assertion of a legitimate business reason in the context of a Privacy Act claim.

There is evidence in the record contradicting Romo's claim that she was justified in accessing Cheng's e-mail account in order to investigate supposed sexual harassment concerns. Romo did not access Cheng's e-mail account until a year after her husband allegedly walked in on Cheng and an employee in a compromising position. Romo was also not aware of any questionable correspondence between Cheng and the employee until *after* she accessed Cheng's e-mail in September, 2007. Romo testified that she never told any of her colleagues that she accessed Cheng's e-mail account and that she never shared the e-mails that she discovered between Cheng and the other employee with her colleagues. If Romo had a genuine concern about sexual harassment, a concern that she claims was so great that it prompted her to access her partner's private e-mail account, then why did she not tell anyone else about the e-mails and take any action to correct the problem?

Romo's claim that she was justified in accessing Cheng's e-mail to investigate suspected financial mismanagement and her "impending freeze-out" is also the subject of dispute. Romo initially testified that she did not read any e-mails between Cheng and the other shareholders. How could she have been investigating financial mismanagement and whether she was being frozen out without looking at e-mails between the other business owners? Romo also changed her testimony several times when asked why she first accessed Cheng's account, which raises serious credibility concerns. Furthermore, there are questions regarding whether Romo's purported reasons for accessing Cheng's e-mail account were actually related to legitimate business interests of Advanced or her personal interests. The case law only supports a legitimate business interest exception for employers. *See Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 519-20 (1984). On at least one occasion, Romo testified that she accessed Cheng's e-mail account because she wanted to know why her husband was put on probation.

Even if Romo did access Cheng's e-mail for business related purposes, it is still "necessary to balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 521 (1984). This balancing test necessarily requires a factual inquiry to determine the relative weight of the parties' interests. Whether Romo's alleged suspicions regarding sexual harassment and financial mismanagement outweighed Cheng's privacy interest in his personal e-mail account are factual issues that cannot be resolved on summary judgment. The attendant circumstances at the time Romo accessed Cheng's e-mail account also raise questions regarding whether Romo's alleged legitimate business interests justified her invasion of Cheng's privacy. Romo testified that she made very little effort to discuss her concerns with her partners before she chose to access Cheng's e-mail without his knowledge.

Lastly, Romo's legitimate business interests argument presumes that she had some authorization to access Cheng's personal e-mail account in the first place, which she did not. Accordingly, genuine issues of material fact exists concerning whether Romo accessed Cheng's e-mail pursuant to a legitimate business interest that preclude the entry of judgment on Cheng's Privacy Act claim.

### E.     Romo's Spoliation Of Critical Evidence Precludes The Entry Of Summary Judgment.

"A litigant has a duty to preserve relevant evidence." *Perez-Velasco v. Suzuki Motor Co. Ltd.*, 266 F. Supp. 2d 266, 268 (D.P.R. 2003) (quoting *Vázquez Corales v. Sea–Land Service, Inc.*, 172 F.R.D. 10, 11–12 (D.P.R. 1997)). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation . . . ." *Id.* (quoting

*Silvestri v. General Motors Corporation,* 271 F.3d 583, 591 (4th Cir. 2001)). Sanctionable

spoliation of evidence occurs when a party intentionally destroys discoverable evidence that it

had a duty to preserve because of an ongoing or anticipated litigation. *McGuire v. Acufex*

*Microsurgical, Inc.*, 175 F.R.D. 149, 154 (D. Mass. 1997). Federal courts have inherent power

to "dismiss the case[s], exclude evidence, or impose other sanctions" when a party has engaged

in misconduct, such as spoliation. *Id.* at 153.

Romo admits to discarding her son's computer, which is the computer she accessed

Cheng's e-mail account from, in 2008 or 2009. At that time, she was either involved in ongoing

litigation with Advanced and Klufas (she filed a lawsuit against them in November, 2008) or at

least knew the information on the computer "may be relevant to anticipated litigation" because

she retained an attorney concerning her employment matters as early as September, 2007. Romo

knew the information on her son's computer was relevant to her dispute with Advanced because

it contained evidence of the information she uncovered as a result of her "investigation" into

Advanced's matters, as well as information regarding the extent of her investigation. She most

certainly at least suspected her interception of the e-mails might come to light. Romo also

should have known to preserve the computer because, as she claims here, she was reviewing

Cheng's e-mail pursuant to Advanced's Employee Manual to investigate financial issues and

sexual harassment concerns. The issues that were central to her purported investigation were

likely to be relevant to her litigation with Advanced and it was foreseeable that her authorization

to access Cheng's e-mail pursuant to the Employee Manual policies would be raised.

Cheng is severely prejudiced by Romo's destruction of her son's computer. A forensic

analysis of the computer would have been able to determine how many times Romo accessed

Cheng's e-mail, what correspondence Romo reviewed, and what, if any, information she stored

168148.2

on the computer as a result of her "investigation." The number of times Romo accessed Cheng's

e-mail account is particularly relevant in this case because the SCA provides for statutory

damages for each instance Romo accessed Cheng's e-mail without his authorization.

Information from the computer would also be useful in the assessment of Romo's credibility.

Given her destruction of evidence, this Court should, at the very least, discount Romo's

testimony and her account of her e-mail sharing agreement with Cheng for purposes of summary

judgment.  Notwithstanding her inconsistent testimony, Romo's intentional destruction of

relevant evidence raises serious concerns about her credibility that, by itself, should bar the entry

of summary judgment.  Indeed, Romo's conduct is sufficient to warrant a negative inference

regarding her claim she only accessed Cheng's e-mail account on five or six occasions.

## CONCLUSION

For the foregoing reasons, Romo's motion for summary judgment should be denied.

DAVID CHENG, M.D.,

By his attorney,

_____/s/ Zachary W. Berk_____
Peter S. Brooks (BBO #058980)
Zachary W. Berk (BBO #663575)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA  02116
DATED:  May 31, 2012         Tel:   (617) 723-3300
Fax: (617) 723-4151

168148.2

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 31, 2012.

_/s/ Zachary W. Berk_
Zachary W. Berk

168148.2